IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHELLE G., | ) |
| Plaintiff, | ) ) |
| | ) No. 18 C 408 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Michelle G., moves for reversal and remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") (doc. # 13). The Commissioner has filed a cross motion, asking the Court to affirm (doc. # 21). The matter is now fully briefed. For the following reasons, we deny plaintiff's motion to remand and grant the Commissioner's motion to affirm.

I.

On February 29, 2012, at age 53, Ms. G. applied for DIB and SSI (R. 458-67), alleging an onset date of January 1, 2007, which Ms. G. later amended to May 30, 2008 (R. 56-57).[2] Her date

---

[1]On February 16, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 6).

[2]The ALJ states that Ms. G. "request[ed] to amend the alleged onset date to May 30, 2008," but that date "was not acknowledged" (R. 18, n.1). However, contrary to this statement, at the most recent hearing in this case, the ALJ clarified that the amended onset date was May 30, 2008 (R. 56-57). Ms. G. does not raise the discrepancy in the alleged onset date in her motion, and it does not affect the outcome here.

last insured was March 31, 2011 (R. 18).³ Ms. G.'s applications were denied initially and on reconsideration, and she sought and received a hearing before an Administrative Law Judge ("ALJ") on October 15, 2014, at which she testified along with medical and vocational experts (R. 99). On January 22, 2015, the ALJ issued a decision denying Ms. G.'s applications for benefits (R. 216-48), but the Appeals Council granted Ms. G.'s request for review and remanded the case to the ALJ (R. 250-52). On October 17, 2016, the ALJ held another hearing (R. 53), and on November 21, 2016, the ALJ issued a decision again denying Ms. G.'s claims for DIB and SSI benefits (R. 17-41). This time, the Appeals Council denied Ms. G.'s request for review of the ALJ's decision, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

In 2003, Ms. G. reported to her internist, Steven Gallo, M.D., that she was having trouble swallowing and would sometimes choke or cough (R. 866). At that time, Ms. G. was diagnosed with thyroid nodules (R. 865).⁴

Dr. Gallo also opined that Ms. G. had myasthenia gravis (R. 865), a condition characterized by weakness and rapid fatigue of muscles, which can lead to difficulties with chewing, swallowing, limb weakness and drooping eyelids (ptosis), among other symptoms.⁵ Dr. Gallo prescribed

---

³To be eligible for DIB, the claimant must show that she was disabled by her date last insured. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). However, the claimant may still be entitled to SSI benefits due to her limited financial means. *Id.*; *see also Moore v. Colvin*, 639 F. App'x 376, 376 (7th Cir. 2016). Although the ALJ recognized that Ms. G. must establish disability on or before the date last insured to be entitled to DIB (R. 18), neither the ALJ nor the parties distinguished between the severity of Ms. G.'s impairments before and after her date last insured. Therefore, we presume, as the parties and the ALJ did, that regardless of the date last insured, if Ms. G. was disabled under the Social Security Act, she would be entitled to SSI benefits due to her limited financial means.

⁴In 2005, she underwent a thyroidectomy to remove her thyroid gland (R. 116). She has been stable on thyroid replacement medicine since then (*Id.*).

⁵https://www.mayoclinic.org/diseases-conditions/myasthenia-gravis/symptoms-causes/syc-20352036.

2

Mestinon (*Id.*), which enhances the communication between nerves and muscles.[6] Ms. G. testified that she stopped working as a mail clerk in 2006 because her muscles would get stiff and sore after sitting or standing for long periods of time (R. 135), and she has not worked since then (R. 20).

Ms. G. also received regular treatment from neurologist, Alan G. Shepard, M.D., to monitor her epilepsy, a condition she had had since childhood (R. 1108). Ms. G. had been seizure-free on Depakote and phenobarbital since 1982 (R. 856). In December 2005, however, Ms. G. reported blacking out and being confused for a few minutes (R. 909). Dr. Shepard described this as an "episode of syncope" (fainting or sudden, temporary loss of consciousness) that could have been a seizure, and he increased her dose of phenobarbital (*Id.*).[7] Dr. Gallo noted that Ms. G.'s last seizure in 1982 was of a similar type (R. 856).

From 2006 through 2009, Dr. Shepard reported that Ms. G. was seizure-free and her myasthenia gravis was stable on Depakote, phenobarbital and Mestinon (R. 910-11).[8] However, in a disability report dated March 13, 2008, Ms. G. reported that she had seizures "often" (R. 537), and her mother, brother, and a friend, Paul Hlepas, submitted seizure description forms to the Bureau of Disability Determination Services ("DDS") in April 2008 stating that Ms. G. had more than one seizure per month, and they had each witnessed her having a seizure -- on September 27, November 27, and December 23, 2007, respectively -- which were characterized by wild and erratic movements (R. 552-54).

In 2010, Dr. Shepard referred Ms. G. to neurologist Senda Ajroud-Driss, M.D., to treat her myasthenia gravis (R. 922). On May 5, 2010, Ms. G. reported to Dr. Ajroud-Driss that she had

---

[6]https://www.mayoclinic.org/diseases-conditions/myasthenia-gravis/diagnosis-treatment/drc-20352040.

[7]Dr. Shepard noted that there had been no tonic-clonic activity (R. 909). A tonic-clonic seizure, also called a grad mal seizure, involves a loss of consciousness and violent muscle contractions. https://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms-causes/syc-20363458.

[8]In 2009, Ms. G. reported that she stopped taking Depakote "due to financial issues" (R. 911).

3

muscle stiffness and weakness in her thighs, hands, shoulders, and throat, which were alleviated with rest and Mestinon (R. 922-23). She also reported that her hand muscles locked up with repetitive movement, and she had intermittent swallowing and speech problems, numbness and tingling in her feet, and double or blurred vision (R. 923-24). On examination, Dr. Ajroud-Driss found Ms. G. had mild bilateral limitation of her lateral gaze, mild bilateral ptosis, mild lower facial/lip weakness, mild deltoid weakness bilaterally, and decreased deep tendon reflexes (R. 924-25). However, Dr. Ajroud-Driss stated that she could not confirm the myasthenia diagnosis in the absence of an EMG and blood and spirometry tests (measuring lung function) (R. 920-21, 925).

In April 2011, Ms. G.'s brother, Mr. Hlepas, and an unidentified neighbor again submitted seizure description forms to DDS, this time stating that Ms. G. had less than one seizure per month, characterized by her whole body shaking or twitching of her hands and feet (R. 611-13). Mr. Hlepas and her brother stated they last witnessed a seizure in 2010, and the neighbor allegedly witnessed one in January 2011 (*Id.*). On June 2, 2011, Ms. G. reported to DDS internal medicine consultative examiner, Alexander Panagos, M.D., that she had three seizures per year; they lasted for five minutes and were not "full blown" tonic-clonic seizures (R. 933). She also reported weakness with repetitive movements and droopy eyelids (*Id.*). Dr. Panagos found Ms. G.'s examination was within normal limits but showed mildly impaired deep tendon reflexes (R. 934-35). On August 5, 2011, Dr. Shepard noted that Ms. G. had "no definite seizures, possibly some little ones" (R. 951).

On December 28, 2011, Ms. G. followed up with Dr. Ajroud-Driss. Dr. Ajroud Driss noted Ms. G. had two abnormal spirometry tests and reported occasional leg pain, but her overnight oximetry test (measuring blood oxygen levels) and neurological evaluation were normal, which

4

was not consistent with active myasthenia gravis (R. 983-84). Dr. Ajroud-Driss opined Ms. G.'s myasthenia gravis was in remission, and she should continue the same dose of Mestinon (R. 980).

In April 2012, Ms. G.'s brother, Mr. Hlepas, and an unidentified friend submitted seizure description forms, this time stating that Ms. G. had more than one seizure per week (R. 681-83). Between the three of them, they alleged witnessing Ms. G. having seizures on January 12, 15, 18, 20, 24, and 27, and February 1, 10, and 11, 2012 (*Id.*). In addition, they described tonic-clonic or grand mal type seizures, stating that Ms. G. lost consciousness for between 10 and 20 minutes, jerked and thrashed, and lost control of her bladder and bowel movements (*Id.*).

On May 3, 2012, Ms. G. told a DDS internal medicine consultative examiner that she had a seizure one week prior (R. 973). The examination was normal, and the examiner opined Ms. G. had a history of grand mal seizure disorder and "well controlled myasthenia gravis" (R. 974-75). On July 18, 2012, Dr. Ajroud-Driss again opined that Ms. G.'s myasthenia gravis was in remission, despite mild ptosis on the right, occasional double vision and swallowing difficulties, and mildly limited deltoid and hip flexors and deep tendon reflexes (R. 987).

In September 2012, Ms. G.'s brother, Mr. Hlepas, and an unidentified friend again filled out seizure description forms (R. 704-06). They stated that Ms. G. had one or fewer tonic-clonic type seizures per month, and that they witnessed them on June 15, 2011, July 10 and 25, 2012, and August 15, 2012 (*Id.*). However, on December 6, 2012, Ms. G. reported to Dr. Shepard that the last seizure she had had was in April 2012 (R. 1076), and on January 9, 2013, Ms. G. told Dr. Ajroud-Driss that she had a grand mal seizure in May 2012 (R. 1093-94). On April 27, 2013, Ms. G. reported blacking out the previous day (R. 1020).

On July 10, 2013, Ms. G. told Dr. Ajroud-Driss that she was having more shortness of breath and fatigue with exertion, and on examination, Ms. G. became fatigued after standing from

a seated position three times (R. 1100). Dr. Ajroud-Driss opined that Ms. G.'s myasthenia gravis was "mildly symptomatic" (*Id.*).

On April 1, 2014, Ms. G. followed up with Dr. Shepard (R. 1074). She reported having "a few episodes of flashing blue lights" and an occasional "migraine aura," but no new neurological issues (R. 1075). On examination, Ms. G. had mild lower left extremity weakness, but otherwise no significant changes (*Id.*).

On May 19, 2014, Mahesh Shah, M.D., performed an internal medicine consultative examination for DDS (R. 1108). Ms. G. told Dr. Shah that she had three to five tonic-clonic type seizures each year (*Id.*). She also reported mild symptoms of myasthenia gravis, including some vision problems from ptosis, difficulty swallowing, and fatigue, but her symptoms were "fairly well controlled with medications" (R. 1108-11). On examination, Ms. G. was rested, and Dr. Shah reported that she exhibited full range of motion, normal gait and grip, normal strength, intact nerves, and full strength (R. 1110-11). However, Dr. Shah also wrote that "[o]nce she starts doing any physical activities, she starts having weakness of the muscle" (R. 1111). After the examination, Dr. Shah completed a physical residual functional capacity ("RFC") form, in which he opined that Ms. G. could do light lifting and sit for six hours, stand for four hours, and walk for one hour in an eight-hour work day, limited to only occasionally climbing ladders and scaffolds and being exposed to unprotected heights in case of muscle weakness (R. 1112-16).

In February and March 2015, Ms. G. sought treatment with neurologist, Xabier Beristain, M.D. Ms. G. reported increased fatiguability over the last year and occasional double vision and trouble swallowing (R. 1332). Dr. Beristain observed Ms. G. had droopy eyelids, but normal speech, full ocular mobility and no facial weakness (R. 1334). He noted that a blood test was suggestive of myasthenia gravis, and he recommended Ms. G. continue taking Mestinon (*Id.*).

## III.

As for her mental health, in June 2012, Ms. G. reported having increased stress due to personal upheaval, including taking care of her elderly mother (R. 684). On July 19, 2012, Ms. G. told Dr. Ajroud-Driss that she had attempted suicide by taking some extra phenobarbital pills; she vomited them up and did not seek medical treatment (R. 987). In October 2012, Ms. G. began meeting with therapist Jennifer Borland; Ms. G. reported having suicidal thoughts, but no intention to hurt herself (R. 1009-12). On November 27, 2012, a DDS psychiatric examination found Ms. G.'s mood was good; her affect, speech, thought content, insight and judgment were appropriate; and she had no orientation or memory deficits (R. 994-95).

In January 2013, Ms. G. no longer felt suicidal, but she told Ms. Borland that she was depressed because she expected her aging mother to die soon (R. 1017). After her mother died in March 2013, Ms. G. was sad and angry (R. 1019). On June 4, 2013, Ms. G. had a psychiatric evaluation (R. 1031). Her mood was depressed and anxious, and she was sad about her mother (R. 1031-32). The psychiatrist diagnosed Ms. G. with moderate major depression (R. 1032), and Ms. G. was prescribed citalopram (R. 1062). From October 2013 through 2014, Ms. G. was doing better, but she was mildly depressed and anxious and cried a few times a week (R. 1067-68).

On May 19, 2014, Michael J. Ingersoll, Psy.D., performed a psychological evaluation for DDS. He observed that Ms. G.'s affect was mildly anxious, and her mood had some mild non-clinical depression (R. 1120). Dr. Ingersoll opined that Ms. G.'s current symptoms of anxiety and depression were "in full remission with the use of medication," and that she had no limitations in her ability to understand, remember and carry out instructions, and "no psychological impairments compromising her ability to do simple labor work consistent w/her work history" (R. 1122-24).

## IV.

On October 15, 2014, at the first hearing before the ALJ, Ms. G. testified only about her myasthenia gravis. She stated that it makes her tired and weak; she has problems going up and down stairs, and she could be on her feet for at most four hours at a time (R. 134, 137). A medical expert, Ashok Jilhewar, M.D., testified that the medical reports in the record showed Ms. G.'s seizures have been in remission since 1982 (R. 109). Regarding myasthenia gravis, Dr. Jilhewar found that Ms. G. had been generally asymptomatic until July 10, 2013, when her myasthenia gravis was described as "mildly symptomatic" (R. 115-16). Dr. Jilhewar stated that Dr. Shah's consultative examination findings were similar to those of her treating neurologist (R. 116). He concluded that Ms. G. should be limited to light work, sitting and standing up to six hours in an eight-hour workday, and never climbing ladders, ropes, or scaffolds or working at unprotected heights (R. 120). Dr. Jilhewar testified that his opinion was based on the conclusions of the medical specialists in the record (R. 125-26). The ALJ left the record open for Ms. G. to obtain an opinion from her treating neurologist, Dr. Ajroud-Driss (R. 133). No such opinion was submitted in the record.

On October 17, 2016, the ALJ held another hearing after the case was remanded by the Appeals Council. Ms. G. testified that her seizures "started acting up again" the previous year (R. 68). Before then, she could walk five blocks to the library every day; but for the past two months she had three seizures per week and was afraid to leave her house (R. 66-68, 81). Mr. Hlepas also testified. He stated that he saw Ms. G. have a seizure in May and October 2016, where "she went into like a semiconvulsion, and her eyes rolled back in her head" (R. 75, 79). Mr. Hlepas also testified that Ms. G.'s hands got stiff when she used them, and it took about 20 or 30 minutes for the stiffness to go away (R. 70-72).

The ALJ gave several hypotheticals to the vocational expert ("VE"). The first hypothetical involved an individual who could perform light work, with additional mental, environmental, and postural limitations (R. 86-87). The VE testified that such an individual could perform Ms. G.'s past work as a mail clerk both as generally performed and as Ms. G. testified she performed it (R. 87). In the second hypothetical, the ALJ limited the individual to standing, walking and sitting up to four hours in an eight-hour workday (R. 88). The VE testified that individual could not perform Ms. G.'s past work as performed by Ms. G., because Ms. G. testified that she stood and walked the full eight-hour day (R. 88-89). However, the VE stated that about half of mail clerk positions may be performed with a sit/stand option, leaving approximately 30,000 mail clerk jobs available nationwide for the individual to perform (R. 88). Ms. G.'s attorney asked the VE to reconcile the Dictionary of Occupational Titles, which lists mail clerk as a light job (which generally require up to six hours of standing) (R. 92). The VE provided his methodology for determining that the mail clerk position could have a sit/stand option or standing/walking/sitting four hours a day as a reduced range of light work (R. 93).

## V.

On November 21, 2016, the ALJ issued an opinion finding that Ms. G. was not under a disability, as defined by the Social Security Act, from January 1, 2007 through the date of the decision, and thus, that she was not entitled to DIB or SSI (R. 40-41). The ALJ began by finding that Ms. G. had the severe impairments of hypothyroidism, myasthenia gravis, history of epilepsy, obesity, depression and generalized anxiety, but that none of them, individually or in combination, met or equaled a listed impairment (R. 20). After reviewing the evidence in the record, the ALJ determined that Ms. G. had the RFC to perform light work, including frequently lifting or carrying

up to 10 pounds and walking, standing or sitting for about six hours in an eight-hour workday, but with additional postural, environmental and mental limitations (R. 30-31).

With regard to Ms. G.'s history of epilepsy, the ALJ recounted numerous inconsistencies in the descriptions of both the frequency and severity of Ms. G.'s seizures, and found that the descriptions were not supported by evidence in the record. For example: (1) in April 2011, Ms. G. reported having petit mal (absence) seizures three times a year, primarily when sitting, lasting about five minutes (R. 33); (2) also in April 2011, Mr. Hlepas and Ms. G.'s brother submitted seizure description forms stating that they witnessed Ms. G. having grand mal type seizures (R. 38); (3) in April 2012, Mr. Hlepas and Ms. G.'s brother stated that they witnessed Ms. G. having more than one seizure per week (*Id.*); (4) on July 18, 2012, Ms. G. told Dr. Ajroud-Driss that she had not had a seizure for 30 years (R. 21, 38); (5) in September 2012, Ms. G. stated that she experienced one seizure per month (R. 38); (6) in May 2014, Ms. G. told Dr. Shah that she had three to five tonic-clonic seizures annually (R. 33); (7) in June 2016, her neurologist opined that she may be having "little seizures" that were atypical absence seizures (*Id.*); and (8) at the October 2016 hearing, Ms. G. testified that she began having seizures more frequently in 2015 (*Id.*).

The ALJ concluded that if Ms. G. had experienced such an increase in seizure activity in 2015, "it would be reasonable to expect that she would have reported that [to] a treating physician. However, there was no evidence showing that she had" (R. 33). In addition, the ALJ noted that the objective evidence was incomplete with regard to Ms. G.'s seizures because Ms. G. never documented her seizures (R. 32-33). Thus, the ALJ did not find Ms. G.'s or Mr. Hlepas's testimony credible as to the severity or frequency of Ms. G.'s seizures.

With regard to myasthenia gravis, the ALJ found neither the neurologists' examinations nor Ms. G.'s reports to her physicians supported her claim that she was severely functionally

limited. *First*, the ALJ noted that Ms. G. testified it was hard for her to walk or stand because her muscles were easily fatigued, and in function reports completed in 2008 and 2012, Ms. G. reported she used a cane (R. 33-34). However, no examining or treating physician had ever documented Ms. G.'s use of a cane; to the contrary, they found she had a normal gait with no assistive device (R. 24, 34). *Second*, even where her neurologist noted she had some fatigue and weakening of the diaphragm muscle in July 2013, the neurologist stated that Ms. G. was "just 'mildly symptomatic'" (R. 23-24). *Third*, Dr. Shah's examination in May 2014 did not show any decreased muscle strength (R. 34-35). *Fourth*, in June 2016, after examining Ms. G., a neurologist opined that Ms. G.'s myasthenia gravis was in remission (R. 24, 34).

The ALJ noted that no treating physician opined on Ms. G.'s RFC (R. 36). The ALJ gave "little weight" to Dr. Shah's RFC opinion because the ALJ found that the extent of the limitations in the opinion were not supported by the available objective evidence, including the normal findings Dr. Shah obtained during his examination of Ms. G. (*Id.*). The ALJ opined that Dr. Shah reached his conclusions by relying on Ms. G.'s self-reported weakness (R. 37). By contrast, the ALJ found that Dr. Jilhewar's testimony from the earlier hearing was still persuasive and entitled to "great weight" (R. 36).

With regard to her mental impairments, the ALJ noted Ms. G. did not testify to any limitations from them, except for stating at the first hearing that she "kind of freak[ed] out in a crowd" (R. 34). The ALJ acknowledged that Ms. G. reported a suicide attempt in 2012, but found that the reports from Ms. G.'s therapist since then showed that despite being sometimes tearful, Ms. G. had improved with treatment and citalopram, she was no longer overwhelmed or suicidal, her depression was in partial remission, and she functioned at a "fairly high level" (R. 27, 35).

The ALJ then found that Ms. G. was capable of performing her past relevant work as a mail clerk based on the assigned RFC, both as that occupation is performed generally and as Ms. G. performed it (R. 39-40). The ALJ further noted that even if Ms. G. was limited to standing and/or walking for no more than four hours out of an eight-hour workday, the VE testified that Ms. G. could still perform her past relevant work (R. 40).

## VI.

Courts review ALJ decisions deferentially to determine if they are supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (internal citations and quotations omitted). "To satisfy this standard, the ALJ must build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (internal citations and quotations omitted). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Ms. G. makes two arguments in favor of remand: (1) the ALJ erred in rejecting Dr. Shah's medical opinion (doc. # 14: Pl.'s Mem. at 4-10), and (2) the ALJ erred in assessing Ms. G.'s subjective allegations as to the intensity, persistence and limiting effects of her pain and symptoms (*Id*. at 10-15). We disagree and affirm the ALJ's decision.

## A.

We address first plaintiff's claim that the ALJ erred in finding her allegations – and those of Mr. Hlepas – "not entirely consistent with the medical evidence and other evidence in the record" (Pl.'s Mem. at 10-14). Ms. G. argues that the ALJ improperly discounted her subjective

12

allegations because they were inconsistent with the objective medical evidence, and she contends the ALJ's credibility determination rested on "meaningless boilerplate" (*Id.* at 11-13). We will overturn an ALJ's credibility decision only if it is "patently wrong," meaning the ALJ did not justify it with specific reasons supported by the record. *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018). "The fact that the ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citations and quotations omitted). As in *Burmester*, we find that "[w]hile the ALJ used boilerplate language here, [s]he went further and included information that supported the decision." *Id.*[9]

As explained above, the ALJ provided many specific reasons for her credibility finding, expounding at length on the inconsistencies in Ms. G.'s, her brother's and Mr. Hlepas's allegations, particularly as related to the frequency and severity of Ms. G.'s seizures but also as to her alleged limitations from myasthenia gravis. In addition, the ALJ did not rely solely on inconsistencies between these allegations and objective medical evidence. To the contrary, the ALJ found Ms. G.'s subjective reports to her treating physicians and specialists were inconsistent with Mr. Hlepas's and her testimony. The ALJ explained that if Ms. G.'s testimony as to her increased seizure activity in 2015 was true, "it would be reasonable to expect that she would have reported that [to] a treating physician. However, there was no evidence showing that she had" (R. 33). And,

---

[9]Ms. G. raises a novel argument, that "[i]n finding that Gallo's allegations were not entirely consistent with evidence, the ALJ presumed that, for the ALJ to credit any of Gallo's subjective allegations, her statements needed to be fully supported by evidence" (Pl.'s Mem. at 11-12). Such a presumption would indeed turn the Social Security standards for assessing credibility on their head. However, that is not what the ALJ did here. In both *Hall*, 906 F.3d at 643-44, and *Burmester*, 920 F.3d at 509, the Seventh Circuit upheld ALJ decisions using similar boilerplate language – finding the claimant's allegations "not fully credible" and "not fully substantiated," respectively – where the ALJs gave specific reasons, supported by evidence in the record, for their credibility findings. We decline to find additional or alternative meanings to this language that the Seventh Circuit has not found. *See also Cooley v. Berryhill*, 738 F. App'x 877, 880 (7th Cir. 2018) (affirming ALJ's credibility finding that the claimant's allegations were "not entirely consistent" with the record where the ALJ cited to specific reasons in the record); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (same, with regard to the phrase "not entirely credible").

regarding myasthenia gravis, the ALJ reviewed the medical reports of Ms. G.'s treating and examining physicians and found that Ms. G.'s reports to them and their examination results were inconsistent with Ms. G.'s allegations (R. 33-34).

Ms. G. also points to numerous specific statements she made in her testimony and argues that the ALJ erred by failing to determine the credibility of each of these statements (Pl.'s Mem. at 11-13). However, when evaluating credibility, the ALJ is not required to identify particular statements that she found not credible. *See Spies v. Colvin*, 641 F. App'x 628, 635 (7th Cir. 2016). Rather, it is enough that the ALJ considered the entire record and supported her determination with specific reasons. *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). For the reasons explained above, the ALJ's adequately supported her credibility determinations.

In addition, Ms. G. contends that the ALJ failed to consider her activities of daily living and her work history in evaluating her credibility (Pl.'s Mem. at 13-14). Contrary to her assertion, the ALJ reviewed Ms. G.'s testimony that her impairments limit her ability to complete activities of daily living and that she needed her brother's help to do certain things (R. 31-32). Ms. G. appears to disagree with the inferences – or lack thereof -- that the ALJ drew from her testimony on these issues. However, despite this disagreement, the ALJ supported her credibility decision with substantial evidence.

Regarding her work history, Ms. G. contends that the ALJ erred by failing to consider that that she worked consistently for 25 years, until 2004, before being unable to continue working due to the limiting effects of her impairments (Pl.'s Mem. at 14). The ALJ recognized that Ms. G. had not engaged in substantial gainful activity since at least 2007 (R. 20), but did not consider Ms. G.'s work history in determining her credibility. A "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Loveless v.*

*Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (quoting *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015)). "But work history is just one factor among many, and it is not dispositive." *Loveless*, 810 F.3d at 508. As in *Loveless*, we find that the ALJ's failure to give weight to the plaintiff's significant work history "is not enough to negate the substantial evidence supporting the adverse credibility finding." *Id*.

**B.**

We turn to plaintiff's arguments regarding Dr. Shah's opinions. In so doing, we note at the outset that the central difference between Dr. Shah's RFC opinion and the RFC finding of the ALJ is that the ALJ limited Ms. G. to walking, standing, or sitting six hours out of an eight-hour workday, while Dr. Shah opined that Ms. G. could only stand for four hours and walk for one hour. However, based on the VE's testimony, the ALJ determined that even if Ms. G. was limited to standing and/or walking for no more than four hours out of an eight-hour workday, Ms. G. could still perform her past relevant work (R. 40). In other words, even if the ALJ had adopted Dr. Shah's RFC opinion, the ALJ would have reached the same result regarding Ms. G.'s ability to work. *See Weaver v. Berryhill*, 746 F. App'x 574, 578 (7th Cir. 2018) (holding that even if the ALJ had imposed the examining doctor's recommended restrictions, they would not prevent claimant from returning to her past job); *see also Cooley v. Berryhill*, 738 F. App'x 877, 881-82 (7th Cir. 2018) (holding that even if the ALJ had overlooked doctor's RFC opinion indicating claimant had additional limitations, any error was harmless where the VE confirmed that someone with those additional limitation could still perform a range of light work).

That said, we find that the ALJ's decision to give little weight to Dr. Shah's opinion was supported by substantial evidence. "Our case law makes clear that "[a]s a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a

15

later reviewer or other compelling evidence.'" *Egly v. Berryhill*, 746 F. App'x 550, 554 (7th Cir. 2018) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014)). Here, the ALJ reviewed Dr. Shah's examination findings in detail before assigning weight to Dr. Shah's RFC opinion (R. 34, 37). The ALJ determined Dr. Shah's RFC opinion deserved little weight in light of the following compelling evidence: it was not supported by Dr. Shah's own examination, it was inconsistent with other evidence in the record, and it was based in part on Ms. G.'s self-reported weakness with activity. Ms. G.'s arguments that the ALJ nonetheless should have accorded Dr. Shah's RFC opinion greater weight is unpersuasive.

1.

Plaintiff contends there was a conflict between the VE's testimony, Dr. Shah's RFC opinion, and the ALJ's findings (Pl.'s Mem. at 10). We disagree. The ALJ asked the VE to consider a hypothetical individual who could stand and/or walk for four hours and sit for six hours (*Id.* at n.4). The ALJ's decision not to include Dr. Shah's additional limitation of walking for one hour did not affect the VE's testimony as to available jobs because the VE specified that the hypothetical individual's ability to stand for four hours was determinative of his opinion that a substantial number of mail clerk jobs would be available, because those jobs have a "sit/stand" option (R. 88). Moreover, even if there was a conflict, it would not have been "fatal because a significant number of jobs in the national economy, so any error would be harmless." *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018). The ALJ made clear in her conclusion that she would not find Ms. G. disabled even if she were as functionally limited as Dr. Shah opined.

2.

In addition, Ms. G. argues that the ALJ erred in giving more weight to Dr. Jilhewar's testimony than to Dr. Shah's opinion. An ALJ may rely upon the opinion of a medical expert to

16

assist with interpreting the record evidence and translate findings into an RFC determination. *Burmester*, 920 F.3d at 511. Ms. G. complains that Dr. Jilhewar is not a specialist in Ms. G.'s impairments, but this "did not disqualify him as a matter of law from being able to opine on the meaning of [Ms. G.'s] medical records." *Plessinger v. Berryhill*, 900 F.3d 909, 914 (7th Cir. 2018). Moreover, plaintiff offers no evidence that Dr. Shah was such a specialist (Pl.'s Mem. at 7).

Ms. G. emphasizes that Dr. Shah examined her while Dr. Jilhewar did not (Pl.'s Mem. at 5-6). However, an ALJ may rely on a testifying medical expert whose opinion is based on objective findings such as x-rays and physical exams. *See Lloyd v. Berryhill*, 682 F. App'x 491, 495 (7th Cir. 2017) (affirming decision where the ALJ credited Dr. Jilhewar's assessment over that of a treating physician). While Dr. Shah examined Ms. G., he only reviewed a 2008 DDS internal medicine examination and a 2012 psychiatric evaluation before completing his evaluation (R. 1108). By contrast, Dr. Jilhewar based his opinions on medical findings by Ms. G.'s long-time treating physicians, including two neurologists who specialize in treatment seizure disorder and myasthenia gravis. Ms. G. claims that Dr. Jilhewar's testimony was not consistent with any of her examining physicians (Pl.'s Mem. at 6-7), but this is incorrect. Although her treating physicians and specialists did not submit RFC opinions, they conducted many examinations that support Dr. Jilhewar's and the ALJ's conclusions that Ms. G.'s impairments were not disabling.

### 3.

Ms. G. also contends that the ALJ erred in rejecting Dr. Shah's RFC opinion because the ALJ did not weigh his opinion according to the checklist of factors in 20 C.F.R. § 404.1527(c), (Pl.'s Mem. at 5-7). ALJs are supposed to consider the factors in Section 404.1527(c) "in deciding the weight [to] give any medical opinion." 20 C.F.R. § 404.1527(c). These factors include the examining relationship, treatment relationship, length of treatment relationship, frequency of

examination, nature and extent of the treatment relationship, supportability of the medical opinion, consistency of the opinion with the record as a whole, and the physician's specialization. *Id.* at 404.1527(c)(1-5). Dr. Shah, of course, conducted only one examination of Ms. G., and he completed his evaluation of Ms. G. – including reviewing the available information, taking history, examining the claimant, and dictating his report – in only 30 minutes (R. 1108). Nevertheless, Ms. G. contends that the ALJ erred in finding that Dr. Shah's RFC opinion was inconsistent with the record as a whole and his own examination findings.

*First*, Ms. G. argues that the ALJ erred because she did not consider that Dr. Shah's findings were consistent with the examination findings of Dr. Panagos, the physician who had conducted a DDS examination in June 2011 (Pl.'s Mem. at 6-7). "The ALJ need not provide a complete written evaluation of every piece of testimony and evidence," so long as the ALJ "confront[s] the evidence that does not support [her] conclusion and explain[s] why it was rejected." *Stephens*, 888 F.3d at 329 (internal citations and quotations omitted). In this case, the ALJ's failure to discuss Dr. Panagos's one-time examination results does not undercut the ALJ's opinion. Dr. Panagos's examination, like Dr. Shah's examination, showed Ms. G.'s results were within normal limits (R. 934-35). The normal findings in these examinations, conducted more than two years apart, support rather than undermine the ALJ's conclusion that the severity of the restrictions in Dr. Shah's RFC opinion was not supported by the objective medical record. Moreover, the ALJ reviewed years of treatment records from Dr. Gallo, Dr. Ajroud-Driss and Dr. Shepard that provided substantial evidence to support the ALJ's decision.

*Second*, Ms. G. disputes that Dr. Shah's RFC opinion was inconsistent with his own examination findings or that Dr. Shah relied on Ms. G.'s subjective reports in formulating his RFC opinion (Pl.'s Mem. at 6). Ms. G. argues that Dr. Shah's opinion that she needed more functional

limitations than shown in her examination was not inconsistent because she was rested during the examination, and Dr. Shah properly concluded that she would need more restrictions if she were not rested (Pl.'s Mem. at 6-8). The ALJ reasonably determined that the more restrictive limitations in Dr. Shah's RFC opinion appeared to have been based on Ms. G.'s "self-reported weakness with activity" because no weakness was evidenced in his examination (R. 37). Plaintiff has not cited to any other source for Dr. Shah's statement that Ms. G. "starts having weakness" with physical activity (R. 1111). We conclude that the ALJ reasonably discounted Dr. Shah's RFC opinion based on its reliance on Ms. G.'s self-reports, because where the ALJ reasonably finds a claimant's subjective allegations exaggerated or otherwise not credible, as the ALJ did here, the ALJ may discount a physician's opinion that is based on the claimant's self-reports. *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018).

## CONCLUSION

For the foregoing reasons, we deny plaintiff's motion for summary judgment (doc. # 13) and grant the Commissioner's cross-motion to affirm the ALJ's decision (doc. # 21). The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: June 3, 2019**